REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 525

September Term, 2015

LAURENCE S. KAYE

v.

LINDA WILSON-GASKINS

Eyler, Deborah S.,
Berger,
Reed,

JJ.

Opinion by Berger, J.

Filed: April 28, 2016

Laurence Kaye ("Kaye"), appellant, an attorney, represented Linda Wilson-Gaskins ("Wilson-Gaskins"), appellee, in a wrongful termination lawsuit filed against Wilson-Gaskins's former employer, Government Employees Insurance Company ("GEICO"). Following that representation, Wilson-Gaskins filed a complaint against Kaye alleging "legal malpractice." The Circuit Court for Montgomery County granted summary judgment in favor of Kaye and dismissed Wilson-Gaskins's complaint. Wilson-Gaskins appealed the dismissal of her claim. We affirmed the judgment of the circuit court and held that Wilson-Gaskins failed to make a *prima facie* case for professional negligence. We further held that a release contained in a settlement agreement between the parties was enforceable.

Thereafter, on March 17, 2015, Kaye filed a three-count complaint in the Circuit Court for Montgomery County alleging, among other things, that the filing of Wilson-Gaskins's lawsuit against Kaye constituted a breach of the parties' settlement agreement. Wilson-Gaskins filed a motion to dismiss Kaye's complaint. Following two hearings, the court dismissed the first two counts of Kaye's complaint. Kaye then voluntarily dismissed count three of his complaint.[1] This timely appeal followed.

---

[1] Neither party addressed whether the circuit court's dismissal of the first two counts of Kaye's complaint constitutes a final judgment. Nevertheless, to the extent the court's judgment might be perceived as lacking finality due to Kaye's voluntary dismissal of count three, we note that the docket entry dismissing counts one and two was made subsequent to the docket entry evincing Kaye's voluntary dismissal. Accordingly, this case presents no final judgment problem.

On appeal, Kaye argues that the circuit court erred in granting Wilson-Gaskins's motion to dismiss his complaint. Specifically, Kaye presents four issues for our review,[2] which we consolidate and rephrase as follows:

> Whether the circuit court erred in dismissing Kaye's complaint for breach of contract.[3]

[2] The issues, as presented by Kaye, are:

1. Whether a party can be held liable for breach of contract, where that party entered into a settlement agreement that does not contain an explicitly worded covenant not to sue, and then filed suit on claims released by the party in that settlement agreement;

2. Whether a release of claims through a settlement agreement carries with it the implied obligation not to sue on those same released claims;

3. Whether the circuit court erred in granting Appellee's motion to dismiss a claim for breach of contract brought by Appellant, where Appellee had entered into a binding and enforceable settlement agreement, and then filed suit on claims released in that agreement; and

4. Whether the circuit court abused its discretion in denying the Appellant's motion for partial summary judgment as to Appellee's liability for breach of contract.

[3] The fourth question presented by Kaye addresses whether the circuit court erred in denying his motion for summary judgment. The circuit court--because it granted Wilson-Gaskins's motion to dismiss--never ruled upon Kaye's motion for summary judgment. Nevertheless, the circuit court's grant of Wilson-Gaskins's motion to dismiss--which we affirm--necessarily precludes the relief Kaye sought in his motion for summary judgment.

For the reasons stated herein, we shall affirm the judgment of the Circuit Court for Montgomery County.

## FACTUAL AND PROCEDURAL BACKGROUND

For thirty-six years prior to her termination, Wilson-Gaskins was a Senior Claims Examiner for GEICO. In that capacity, Wilson-Gaskins was "responsible for overseeing and handling a case from beginning to end." She handled cases "including major bodily injury, or any case where litigation was anticipated," and she was "responsible for processing the entire case on [her] own," including "contacting and interviewing witnesses, evaluating medical evidence, attempting to settle cases without litigation, referring the cases to outside counsel and ensuring that counsel was properly handling the case."

Wilson-Gaskins alleged that, on March 20, 2006, she was "constructively discharged" from her employment with GEICO, after being told that if she did not retire, she would be terminated for "gross misconduct." Kaye, and The Kaye Law Firm, subsequently represented Wilson-Gaskins in a lawsuit for wrongful discharge in the Circuit Court for Montgomery County captioned *Linda Wilson v. Government Employees Insurance Co.*, Case No. 279956V. On June 9, 2009, following a trial, the jury returned a verdict in favor of Wilson-Gaskins in the amount of $1,415,991. Despite her significant recovery, Wilson-Gaskins was not satisfied with Kaye's handling of the litigation.

On June 14, 2009, Wilson-Gaskins wrote Kaye a letter requesting that "the proceeds from the jury award . . . be held and not be disbursed in any way, until we have reached an

3

agreement on the total distribution to include Attorney fees, cost [*sic*] and expenses." She stated that she was "requesting this action because of [her] overall dissatisfaction with the handling of [her] case from a legal standpoint." Specifically, Wilson-Gaskins expressed that she was dissatisfied with several aspects of Kaye's representation, including Kaye's decision to file the claim in Montgomery County instead of "the more favorable jurisdiction of Prince George[']s County"; delays in filing suit and with trial dates "as a result of [Kaye's] needs"; the "failure to allege counts of retaliation and breach of contract" until beyond the statute of limitation (resulting in dismissal of those claims); and the failure to prove, to the satisfaction of the court, counts for discrimination and wrongful termination (resulting in dismissal on the discrimination count and the court's denial of an award for punitive damages). Wilson-Gaskins asserted that, as a result of Kaye's actions, she incurred "substantial financial loss," and requested a "substantial reduction in [his] attorney fees."

On June 17, 2009, Kaye sent Wilson-Gaskins a letter by facsimile regarding "Disbursement of Funds/Settlement of Claims." That letter provided, in relevant part:

> In the past two days, you and I have engaged in a series of discussions regarding the disbursement of funds, settlement of your claims against GEICO, and allegations that I and The Kaye Law Firm somehow mishandled aspects of your case.
>
> After our discussions, we arrived at a variety of agreements regarding actions to be taken. I am summarizing them below:
>
> 1.     You authorize me to inform [GEICO's counsel] that you agree that there will be no appeal of any issues of the

4

case, and you are prepared to fully settle all claims, upon the payment of the $1,415,991.00 awarded in this case.[4]

2.     Assuming the settlement of the case at this point, Kaye Law Firm will receive an <u>additional</u> $275,000.00 in attorney fees for its representation of you in this matter, beyond what you have already paid in attorney fees earlier in this case ($45,000.00).  You understand that this fee represents a significant reduction from the fees to which we are entitled as set forth in our retainer agreement.  We have agreed that this is a flat fee.

. . .

7.     You and I have agreed that we will sign a separate agreement between yourself, The Kaye Law Firm, and myself, which will include complete releases of any and all claims, including claims for professional negligence arising out of our handling of the case . . . . You will act expeditiously to execute such release, and I agree not to disburse our attorney fees until that release is executed.

I believe that this letter accurately describes our discussions on the various issues set forth above.  If you are in agreement with the contents of the letter, and give me your approval to proceed accordingly, please indicate this by signing your name below and sending the letter back to me by facsimile.

Wilson-Gaskins's signature appears on the letter, dated "6-7-09."

---

[4] Both parties had several issues that could have been raised on appeal.  Instead of appealing, Wilson-Gaskins and GEICO reached a settlement agreement.  Pursuant to the agreement, Wilson-Gaskins released her claims against GEICO, and GEICO agreed to pay her the full amount of the verdict, but with a restructuring of the payment schedule.

On July 7, 2009, Wilson-Gaskins, Kaye, and The Kaye Law Firm entered into a settlement agreement. The settlement agreement contains what purported to be a release which provides in relevant part:

> A. Wilson[-Gaskins] does release and forever discharge Kaye . . . [his] agents, servants, employees and all other persons, firms, associations, and corporations, past and present, of and from any and all actions, claims and demands including claims or actions for contribution or indemnity of whatever nature now existing or which may hereafter arise out of the legal representation of Wilson[-Gaskins] in regard to [Case No. 279956] including any consequences thereof now existing or which may develop, whether or not such consequences are known or anticipated. Kaye does release and forever discharge Wilson[-Gaskins] from any and all actions, claims and demands including claims or actions for contribution or indemnity of whatever nature now existing or which may hereafter arise out of the legal representation of Wilson[-Gaskins] in regard to [Case No. 279956] including any consequences thereof now existing or which may develop, whether or not such consequences are known or anticipated.
>
> . . .
>
> C. Wilson[-Gaskins] further acknowledges:
>
> (1) That she understands that before signing this General Release she was aware that she could, if she chose, consult with another lawyer of her choosing, that such consultation or representation is appropriate and that she has either consulted with an attorney of her choosing or voluntarily chosen to enter into this General Release without such independent consultation.
>
> (2) That no additional promise or agreement has been made as consideration for this Release and that the signing thereof has not been induced by any representations of the parties released, or by anyone in their behalf, concerning the

6

nature, extent or duration of the injuries or damages sustained, or any other matter.

. . .

D.   In recognition of the work Kaye performed on behalf of Wilson[-Gaskins] in conjunction with [Case No. 279956], Wilson[-Gaskins] agrees that Kaye shall be entitled to an additional attorney fee in the amount of Two Hundred Seventy-Five Thousand Dollars ($275,000.00) beyond any attorney fees already paid to Kaye (which the parties agree has been approximately $45,000.00 at the inception of the case) prior to the date of the execution of this Release, and that Wilson[-Gaskins] continues to be responsible for all costs incurred in the prosecution of [Case No. 279956].  Wilson[-Gaskins] has also agreed that Kaye should be paid an additional Twenty-Five Thousand Dollars ($25,000.00) as a retainer for costs, and will pay any additional costs not covered by the retainer promptly from the moneys she has recovered as a result of her judgment in [Case No. 279956].

E.   Wilson[-Gaskins] recognizes and agrees that the additional attorney fees received by Kaye represent a reduction in what Kaye would otherwise have been entitled to under the retainer agreement in effect between the parties.

F.   Wilson[-Gaskins] agrees that she retained separate counsel for the purposes of advising her as to matters about taxation, and she is solely responsible for paying her tax counsel.  Wilson[-Gaskins] further acknowledges that Kaye has not held himself out to be an expert in the taxation of settlements and or damages.

G.    Wilson[-Gaskins] agrees that she has reviewed this Agreement and General Release, and understands each and every provision of it.

Both Wilson-Gaskins and Kaye signed the settlement agreement.

7

On June 1, 2012, Wilson-Gaskins, *pro se*, filed a complaint in the Circuit Court for Prince George's County against Kaye, Kaye's professional liability insurer, and GEICO, alleging that they had engaged in "legal malpractice, retaliation and collusion." Thereafter, Wilson-Gaskins retained counsel, venue was transferred to Montgomery County, and GEICO as well as Kaye's professional liability insurer were dismissed from the action.

In an amended complaint, Wilson-Gaskins asserted that Kaye's breach of his professional duty of care constituted professional negligence and a breach of contract. Wilson-Gaskins alleged that she "suffered economic damages due to payment of unnecessary taxes, legal fees and similar expenses in excess of $75,000." Kaye, in response, filed a motion to dismiss the amended complaint, or in the alternative, a motion for summary judgment. In his motion, Kaye argued that Wilson-Gaskins's complaint was barred by the release in the parties' settlement agreement.

After a hearing, the trial judge granted Kaye's motion for summary judgment. Notably, the trial court did not expressly ground its decision in the language of the release contained in the parties' settlement agreement. Rather, the court found that Wilson-Gaskins had not alleged facts sufficient to show that Kaye breached the relevant standard of care, that Wilson-Gaskins had failed to show that she suffered damages,[5] and that any damages she

---

[5] Before the circuit court, Wilson-Gaskins acknowledged that under her settlement with GEICO, she was entitled to the entire amount of the jury verdict. She claimed that she suffered damages, however, because the settlement "allowed GEICO to issue the annuity." This was apparently material to her because "[Wilson-Gaskins] hated GEICO" and "has a
(continued...)

8

did suffer were not caused by Kaye. Accordingly, the circuit court found that Wilson-Gaskins failed to make a *prima facie* showing of professional negligence or a breach of contract. As such, the circuit court granted Kaye's motion for summary judgment. Wilson-Gaskins appealed the circuit court's order granting summary judgment.

In an unreported opinion filed June 11, 2014, we affirmed the circuit court's grant of Kaye's motion for summary judgment. Initially, we held that the court was legally correct in finding that Wilson-Gaskins had failed to make a *prima facie* showing establishing that she was entitled to the relief she sought in her complaint. Accordingly, we affirmed the circuit court decision because Kaye had shown that there was no genuine dispute as to any material fact and that he was entitled to judgment as a matter of law. We continued, however, to address the enforceability of the release that Wilson-Gaskins signed.[6] Upon considering the release, we held that:

> [Wilson-Gaskins] presented no facts of substantive unconscionability. Indeed, when the court asked what damages Ms. Wilson-Gaskins suffered as a result of Mr. Kaye's actions, counsel never mentioned that the Release was unfair or

---

[5] (...continued)
right to not have a further relationship with GEICO."

[6] We justified the basis upon which we reviewed this question for two reasons. First, the trial judge's decision was unclear as to whether he had based his decision on Wilson-Gaskins failure to make a *prima facie* case for professional negligence or the release signed by Wilson-Gaskins. Secondly, we justified our decision to consider the question based on the principle that we may affirm the grant of summary judgment on a ground not relied upon by the circuit court if "the alternative ground is one that the motions judge would have had no discretion to reject." *Dehn Motor Sales, LLC v. Schultz*, 212 Md. App. 374, 392 n.26 (2013).

9

unreasonably harsh. The Release here was not unconscionable, and given that Ms. Wilson-Gaskins released all claims against Mr. Kaye "now existing or which may hereafter arise" out of the underlying litigation, the grant of summary judgment in favor of Mr. Kaye was proper.

Following our holding, Kaye filed a complaint in the Circuit Court for Montgomery County against Wilson-Gaskins. In his complaint, Kaye alleged that by filing her complaint, Wilson-Gaskins breached the release contained in the parties' settlement agreement. Kaye further alleged that Wilson-Gaskins breached the implied covenant of good faith and fair dealing, and that she was anticipating further breaches of the contract. In response, Wilson-Gaskins, filed a motion to dismiss Kaye's claims for breach of the release, and breach of the implied covenant of good faith and fair dealing. Additionally, Kaye filed a motion for partial summary judgment, claiming that our prior opinion affirmatively established Wilson-Gaskins's liability as the law of the case. After two hearings, the circuit court acknowledged that the release absolved Kaye of liability for conduct within the scope of the agreement. Nevertheless, the court found that the agreement did not provide Kaye with an affirmative cause of action to pursue damages against Wilson-Gaskins. Accordingly, the circuit court granted Wilson-Gaskins's motion to dismiss counts one and two of Kaye's complaint.

Kaye, then, voluntarily dismissed count three of his complaint. This timely appeal followed. Additional facts will be discussed as necessitated by the issues presented.

**STANDARD OF REVIEW**

10

Under Maryland Rule 2-322(b)(2), a defendant may seek a dismissal of a complaint if the complaint fails "to state a claim upon which relief can be granted." Indeed,

> "[t]he proper standard for reviewing the grant of a motion to dismiss is whether the trial court was legally correct. In reviewing the grant of a motion to dismiss, we must determine whether the complaint, on its face, discloses a legally sufficient cause of action." In reviewing the complaint, we must "presume the truth of all well-pleaded facts in the complaint, along with any reasonable inferences derived therefrom." "Dismissal is proper only if the facts and allegations, so viewed, would nevertheless fail to afford plaintiff relief if proven."

*Higginbotham v. Pub. Serv. Comm'n of Md.*, 171 Md. App. 254, 265-66 (2006) (quoting *Britton v. Meier*, 148 Md. App. 419, 425 (2002)). "When moving to dismiss, a defendant is asserting that, even if the allegations of the complaint are true, the plaintiff is not entitled to relief as a matter of law." *Heist v. E. Sav. Bank, FSB*, 165 Md. App. 144, 148 (2005). Accordingly, we will review Kaye's complaint to determine whether the allegations presented satisfy the elements necessary to obtain the relief sought. In so doing, we will accept as true the factual allegations made in the complaint, but we review the legal premises upon which Kaye's relief is sought *de novo*.

In the present action, Kaye seeks relief for an alleged breach of contract arising from the breach of the release contained in the parties' settlement agreement. Accordingly, in reviewing the circuit court's grant of Wilson-Gaskins's motion to dismiss, we accept Kaye's factual allegations, but we review *de novo* whether the allegations presented amount to a breach of the settlement agreement.

11

**DISCUSSION**

In the instant litigation, Kaye contends that he is entitled to recover damages for Wilson-Gaskins's breach of the parties' settlement agreement. Specifically, Kaye asserts that the release contained in the agreement did not only immediately discharge any claim Wilson-Gaskins had against Kaye, but it also constituted a promise not to sue Kaye for claims arising out of his representation in the future.[7] Wilson-Gaskins, for her part, argues that the parties' agreement contains no continuing obligation for her to refrain from litigating against Kaye. Moreover, Wilson-Gaskins maintains that even if a covenant not to sue is read into the contract, that agreement was not breached. Additionally, Wilson-Gaskins asserts that we should construe the release against Kaye as he is the drafter, that she pursued her litigation in good faith, and that public policy prohibits Kaye from limiting his liability in this sort of fashion.

The gravamen of the question as to whether Wilson-Gaskins breached the release requires us to identify, interpret, and apply the settlement agreement that the parties entered

---

[7] In his notice of appeal, Kaye purports to challenge the circuit court's order dismissing his breach of contract claim, and count two of his complaint alleging a breach of the implied covenant of good faith and fair dealing. Initially, "Maryland does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing." *Magnetti v. Univ. of Md.*, 171 Md. App. 279, 285 n.3 (2006). Rather, the covenant is an implied term of the contract that, if breached, would serve as an alternative theory for maintaining a breach of contract action. *Id.* Nevertheless, in his reply brief, Kaye assures us that with respect to his allegation that Wilson-Gaskins breached the covenant of good faith and fair dealing, "he is not seeking to overturn that decision by the Circuit Court." Accordingly, we do not address whether the circuit court erred in dismissing Kaye's claim that Wilson-Gaskins breached the covenant of good faith and fair dealing in this appeal.

into on July 7, 2009. Accordingly, in analyzing this question, we must identify the agreement between the parties. Upon identifying the agreement between the parties, we move to interpret the terms of that agreement. Only after we interpret the terms of the agreement will we apply the agreement and determine whether Kaye has pleaded sufficient facts that, if proven, would entitle him to the relief he seeks. For the reasons stated herein, we hold that the settlement agreement reached by the parties only discharged obligations owed to Wilson-Gaskins, and that Wilson-Gaskins tendered complete performance upon effectuating the release. Accordingly, Wilson-Gaskins could not have breached an obligation that already had been discharged. We, therefore, hold that the circuit court did not err in granting Wilson-Gaskins's motion to dismiss Kaye's complaint.

**I.      The July 7, 2009 Settlement Agreement Is Enforceable Against the Parties.**

Initially, we note that there is a signed agreement between the parties, and that agreement is enforceable. This is so because we have previously held that the settlement agreement was not unconscionable and was enforceable. *See Wilson-Gaskins v. Kaye*, No. 692, Sep. Term 2013 (Md. Ct. Spec. App. 2014). Accordingly, our holding that the settlement agreement is enforceable between the parties constitutes the law of the case. *See Haskins v. State*, 171 Md. App. 182, 189-90 (2006) ("'[O]nce an appellate court rules upon a question presented on appeal, litigants and lower courts become bound by the ruling, which is considered to be the law of the case.'" (quoting *Scott v. State*, 379 Md. 170, 183-84 (2004))).

13

Wilson-Gaskins asserts in her brief that our prior decision is not the law of the case because we affirmed the circuit court's dismissal of her claims on the grounds that she had not made a *prima facie* case for professional negligence, *not* because the settlement agreement precluded the action. As such, Wilson-Gaskins perceives our opinion on the validity of the settlement agreement as *dicta* and not the law of the case. We disagree.

> When a question of law is raised properly by the issues in a case and the Court supplies a deliberate expression of its opinion upon that question, such opinion is not to be regarded as *obiter dictum*, although the final judgment in the case may be rooted in another point also raised by the record.

*Schmidt v. Prince George's Hosp.*, 366 Md. 535, 551 (2001).

For the reasons we articulated in our previous opinion, the question of the validity of the settlement agreement between the parties was properly presented in the prior appeal. Accordingly, we affirm the enforceability of that agreement because the validity of that agreement constitutes the law of the case.

**II.     A Promise Never to Sue Will Generally Operate to Discharge Obligations Owed by the Promisee to the Promisor.**

Having concluded that the July 7, 2009 settlement agreement is enforceable and binds the parties, we must interpret the terms of that agreement. "Settlement agreements are enforceable as independent contracts, subject to the same general rules of construction that apply to other contracts." *Maslow v. Vanguri*, 168 Md. App. 298, 316 (2006). We begin by observing that the interpretation of a contract is a question of law subject to *de novo* review.

14

*Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7 (2014). Moreover, in Maryland, we employ the objective theory of contracts, under which:

> "[A court is to] determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean."

*Id.* at 8 (alteration in original) (quoting *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985)). As the Court of Appeals set forth in *Gen. Motors Acceptance Corp.*, and again in *Spacesaver Sys., Inc.*, we emphasize that our paramount concern as we seek to interpret the parties' agreement is to objectively determine what a reasonable person in the position of the parties would have intended this agreement to mean at the time it was effectuated.

The settlement agreement in this case aimed to resolve a dispute that arose from Kaye's representation of Wilson-Gaskins in her action against GEICO. Wilson-Gaskins was contemplating pursuing a professional negligence claim against Kaye. In consideration for

15

"a reduction in what Kaye would otherwise have been entitled to under [the parties'] retainer agreement,"[8] Wilson-Gaskins agreed to:

> [R]elease and forever discharge Kaye . . . of and from any and all action, claims and demands including claims or actions for contribution or indemnity of whatever nature now existing or which may hereafter arise out of the legal representation of Wilson[-Gaskins] in regard to Lawsuit including any consequences thereof now existing or which may develop, whether or not such consequences are known or anticipated.

In Wilson-Gaskins's prior appeal, we held that this agreement operates as a release that discharged any amount to which Kaye may have been liable to Wilson-Gaskins. The question in this case, however, is whether the language in this agreement expresses an affirmative promise by Wilson-Gaskins not to sue on claims within the scope of the agreement. Kaye contends that the release given by Wilson-Gaskins contains an implied obligation to refrain from suing Kaye. Wilson-Gaskins, on the other hand, avers that her obligation under the contract was discharged at the time the release was effectuated. In order to resolve this inquiry, we must address the distinction between a release and a covenant not to sue.

"Releases are contractual, and they are therefore governed by ordinary contract principles." *Chi. Title Ins. Co. v. Lumbermen's Mut. Cas. Co.*, 120 Md. App. 538, 548

---

[8] In a letter signed by Wilson-Gaskins on June 17, 2009, the parties agreed that the reduction in Kaye's attorney's fees was "significant." In his complaint, Kaye attests that the consideration he gave for this agreement amounts to approximately $78,997.75. In total, Kaye's assent to the settlement agreement effectively reduced his contingent fee from 25% to 19.42% of Wilson-Gaskins's recovery in her action against GEICO.

(1998). Indeed, "it is well settled that '[a] release is to be construed accordingly to the intent of the parties and the object and purpose of the instrument, and that intent will control and limit its operation.'" *Owens-Ill., Inc. v. Cook*, 386 Md. 468, 495 (2005) (alteration in original) (quoting *Shriver v. Carlin & Fulton Co.*, 155 Md. 51, 64 (1928)). Because the nature and scope of a release is defined by, and in accordance with, the intent of the contracting parties as determined from an objective perspective, there is a notable dearth of authority articulating the exact definition of a release. The Court of Appeals has, however, endeavored to define a release generally as "[a] giving up or relinquishment as of a right or claim[,] [t]he giving up or abandoning a claim or right to the person against whom the claim exists or the right is to be exercised or enforced[, or a] surrender of a right." *Whitcomb v. Nat. Exch. Bank of Balt.*, 123 Md. 612, 690 (1914) (internal quotations and citations omitted).

At common law, a release was an action on the part of an obligee to discharge an obligation, and was most relevant in the context of an action by a plaintiff against joint tortfeasors. In the context of joint tortfeasors, the identity of the obligor to whom a release was given was immaterial. Rather, a release was an affirmative act by an obligee to discharge a debt then owed regardless of whom the obligor or obligors may be. *See Roe v. Citizens Nat. Bank*, 32 Md. App. 1, 5 (1976) ("[U]nder the common law, the release of one joint debtor was a release of all."); *Shriver*, *supra*, 155 Md. at 60 ("[A] release of a judgment as to one of several joint defendants operated as a release of all." (citing *Booth v. Campbell*, 15 Md. 569, 572 (1860))); *see also Smith v. State, to Use of Balt. Cnty. Comm'rs*, 46 Md.

17

617, 619 (1877) ("[T]he release of one or more sureties without the assent of the cosureties will operate at law to discharge the latter." (emphasis omitted)).  The concept that a release operates to discharge an obligation rather than an obligor is reflected in the Restatement (Second) of Contracts.  The Restatement defines a release as follows:

> § 284. Release
>
> (1) A release is a writing providing that a duty owed to the maker of the release is discharged immediately or on the occurrence of a condition.
>
> (2) The release takes effect on delivery as stated in §§ 101-03 and, subject to the occurrence of any condition, discharges the duty.

Restatement (Second) of Contracts § 284 (1981).

Critically, a release takes effect immediately.  *Id.*  As a consequence, a release immediately discharges any obligation within the scope of the agreement.  *Id.*  Accordingly, because a release has the effect of immediately discharging an obligation, the release is tendered at the time the release is given.  Therefore, a release cannot be breached because complete performance is tendered at the moment release is effectuated.

In some instances--again, generally in the context of joint tortfeasors--the common law rule that a release had the effect of discharging an obligation rather than an obligor was perceived to apply too harshly when an obligee provided a release with an obvious intent only to discharge one but not all obligors.  *Shriver*, *supra*, 155 Md. at 61.  In an effort to "escape the harshness of the common-law rule . . . the fiction of a covenant not to sue" was

18

developed to accommodate the circumstance when a plaintiff intended to discharge one, but not all obligors. *Id.* A covenant "is an agreement duly made to do or not do a particular act and is a contractual obligation." *White v. Pines Cmty. Improvement Ass'n*, 173 Md. App. 13, 38 (2007), *aff'd in part rev'd in part*, 403 Md. 13 (2008). A covenant not to sue, therefore, is a promise to forbear from litigating with respect to an obligation. Critically, while a release addresses the relationship between the obligee and the obligation, the covenant not to sue addresses the relationship between the obligor and the obligee. Accordingly, the covenant not to sue had the practical effect of providing an obligor with immunity against those seeking to enforce the underlying obligation,[9] but the covenant did not actually discharge the underlying obligation with respect to other obligors.

To be sure, contrary to a release, a covenant not to sue did not have the effect of discharging an obligation, but rather the covenant was a promise made by the obligee to refrain from enforcing the obligation. This distinction permitted a plaintiff to reach a settlement with one joint tortfeasor without discharging the obligation with respect to the remaining obligors. This concept is reflected in the Restatement (Second) of Contracts, which defines a contract not to sue[10] as "a contract under which the obligee of a duty

---

[9] An obligor who is jointly and severely liable for an obligation and who is the promissee of a covenant not to sue may nevertheless remain liable to his co-obligors for contribution.

[10] The Restatement (Second) of Contracts uses the largely synonymous term "contract not to sue" in lieu of "covenant not to sue" "to avoid any suggestion that it must be under seal." Restatement (Second) of Contracts § 285 cmt. a.

19

promises never to sue the obligor or a third person to enforce the duty or not to do so for a limited time." Restatement (Second) of Contracts § 285.

The material distinction between a release and a covenant not to sue is that a release is an immediate discharge, and performance is complete at the time the release is effectuated. A covenant not to sue, on the other hand, is a promise for the maker to undertake the future performance of forbearance from litigation. Stated differently, "[d]ischarge by release . . . has long been regarded as an executed transaction rather than an executory promise" whereas "a covenant not to sue . . . was treated as an executory promise." Restatement (Second) of Contracts § 295 cmt. a. For this reason, a lawsuit predicated on claims that have been released cannot be actionable as a breach of contract, because a release is a unit of consideration that is tendered--and the obligee's promise under the contract is discharged--immediately at the time of contracting.[11] A covenant not to sue, however, can generally be breached if performance is not subsequently rendered in accordance with the promise.

---

[11] Conceivably, a pleading alleging damages arising from released claims may, in some circumstances, be sanctionable under Md. Rule 1-311(c) or Md. Rule 1-341. Moreover, some other cause of action might be actionable in tort for a plaintiff who has been sued on released claims and has suffered sufficient damages that are attributable to a defendant who acts with malice and who initiated the lawsuit without probable cause. *See Havilah Real Prop. Serv., LLC v. Early*, 216 Md. App. 613, 624-25 (2014). For our purposes, however, it is sufficient to hold that a release, in the technical sense of the word, can neither be breached nor can it serve as the basis for a breach of contract action.

An analytical problem arises where, as here, an obligee purports to release obligations which have yet to accrue. For the reasons stated above, a release takes effect immediately. Accordingly, at common law the release of an obligation that had yet to accrue was "anomalous, and, in the view of early lawyers, an impossibility." 29 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 73:5 (4th ed. 2003 & Supp. 2009) (citing *Hoe v Marshall*, (1592) 78 Eng. Rep. 823 (K.B.) Cro. Eliz. 580, 823 ("A release of all actions, duties, and demands given to bail, pending the action against the principal cannot be pleaded in bar to a *scire facias* on the subsequent judgment.")). Stated differently, it would be *ultra vires* for one to release (*i.e.,* discharge) a right which they have yet to possess. Indeed, comment a to § 284 of the Restatement (Second) of Contracts provides that a release must:

> [T]ake effect immediately or on the occurrence of a condition. A promise to discharge in the future an existing duty merely creates a new duty that can itself be discharged by the parties. Such a promise is not a release. The duty that is released need not be matured. A purported release of a duty that does not yet exist, however, is not a release but a promise to discharge a duty in the future. . . .

Restatement (Second) of Contracts § 284 cmt. a.

Therefore, under the common law a release in anticipation of an obligation that had yet to accrue was not actually a release, but rather a covenant never to sue. Modern commentary, however, suggests that this problem should be resolved by interpreting such an arrangement as a covenant never to sue, but nevertheless giving the agreement the same

21

effect as a discharge. *See* Restatement (Second) of Contracts § 285(2) ("[A] contract never to sue discharges the duty."). This position advances the concept that a release of a future claim is incorrect as a matter of semantics. Nevertheless, this position advocates construing a purported release of a future claim as a discharge because such an interpretation more accurately captures the intent of the parties. Professor Jenkins explains in her treatise that a contract never to sue:

> Because of its form–a promise by the creditor–it may appear that the parties intended to create a duty in the creditor, rather than to discharge an existing duty in the debtor. In spite of its promissory form, a contract never to sue indicates an intention to discharge the obligor in any case not involving a joint obligor, and the parties are held to have consummated a discharge because of the legal effect of their intent.
>
> Historically, to refuse to give a contract not to sue effect as a discharge resulted in an unnecessary and highly undesirable circuity of action. The creditor would sue the debtor for the enforcement of the original claim; the debtor could at once maintain a counteraction for damages for the breach of the creditor's promise never to sue. The damages to which the debtor would be entitled in this counteraction would include the amount of the creditor's recovery in the primary action against the debtor. To avoid such a result, the contract not to sue operated as a release.

13 Sarah Howard Jenkins, *Corbin On Contracts: Discharge* § 67.14 (Joseph M. Perillo ed., Revised ed. 2003 & Supp. 2008). Stated differently:

> [W]here one person only is subject to a specific duty, if violation of the contract by suing for the debt and recovering judgment therefor were permitted it would entitle the defendant to bring a cross-action on the promise not to sue in which the precise amount of that judgment would be recovered back. The contract

22

> never to sue is therefore automatically enforced by treating the debt as discharged in order to avoid circuity of action.

Restatement (First) of Contracts § 405 cmt. a (1932).

Under the principles expressed by Professor Jenkins and the Restatement (First) of Contracts, although a release cannot discharge obligations which are not yet owed to the obligee, such a release should nevertheless automatically operate to immediately discharge such obligations. This concept is similar to the manner in which title to property passes immediately through a grantor at the precise moment when the grantor acquires title which he has previously purported to convey. *See*, *e.g.*, *Hughes v. Insley*, 155 Md. App. 608, 625 (2003) (quoting *Columbian Carbon Co. v. Knight*, 207 Md. 203, 210 (1955) ("This principle is based upon the ancient doctrine that such a deed operates upon the after-acquired title by way of estoppel. It has been stated that the title vests by operation of law or by inurement as soon as it is acquired by the grantor, without the need of judicial aid, in order to prevent circuity of action.")). Similarly, when an obligee purports to release a claim to which she has no right, if the obligee later acquires rights to enforce the claim, the claim will generally be discharged immediately by operation of law upon the obligee's acquisition of the right.

We are convinced that, in most circumstances, the intent of parties who contract to release unaccrued claims is for those claims to be discharged. We are unpersuaded, however, that we need to adopt the bright-line rule that a covenant never to sue an obligor should always operate only as a release. Indeed, the critical and operative assumption in the proposition that a contract never to sue should operate to discharge future obligations is that

23

"a contract never to sue indicates an intention to discharge the obligor." *Jenkins*, *supra*, § 67.14.

It may be true that in most cases the intent of an agreement to release claims that have yet to accrue is only to provide a discharge of any obligation that may arise. In such a case, the contract damages would equal any recovery the obligee could obtain by violating the covenant not to sue. It is, however, also cognizable that a covenant never to sue could represent a bargain for not only a discharge of the obligor's liability, but also a promise that the obligor would not later be forced to suffer the indignity of defending against such claims. *See*, *e.g.*, *Maslow*, *supra*, 168 Md. App. at 324-25, 31 (holding that a high-low settlement agreement in exchange for a promise not to appeal a jury verdict "sought two closely related things: limitation of their exposure risks and finality."). If the latter intent is expressed, the obligor's damages for the breach of the covenant never to sue would exceed the obligee's claim to the obligation to the extent the obligor suffered consequential damages arising from defending against the released claims.[12]

We do not mean to reject the proposition that a covenant never to sue is often the functional equivalent of a discharge. Rather, we merely decline to impose a bright-line rule

---

[12] In her brief, Wilson-Gaskins contends that if we construe the parties' agreement to articulate this latter intent, such a construction is unenforceable because public policy prohibits an agreement that "effectively preclude[s] any challenge to the validity or scope of a release . . . ." We emphasize that we offer no opinion as to whether a contract made between an attorney and client to release claims and to award damages for subsequent challenges to the release would be unenforceable as a matter of public policy.

that may, in some circumstances, undermine an objective understanding of the parties' intent. Indeed, parties need not employ magic language in a contract in order to include a release, a covenant not to sue, or both. Rather, in construing the parties' contract, we aim to discern "what a reasonable person in the position of the parties would have meant at the time it was effectuated" to determine whether the parties sought a release, a covenant not to sue, or both. *Spacesaver Sys., Inc.*, *supra*, 440 Md. at 8. Accordingly, in order to avoid circuity of action, when parties agree that an obligee will never pursue a claim, we will give that language the effect of a discharge unless the parties clearly express that they intend for the obligor to recover consequential damages as a result of the obligee's failure to honor that discharge in their agreement.

### III.    The Circuit Court Did Not Err in Finding That Wilson-Gaskins's Obligation Was Discharged Upon the Tender of Her Performance.

In the instant case, the parties disagree as to whether the conduct that gave rise to this litigation arose prior to or after the settlement agreement took effect. In this appeal, we need not opine on whether the obligation, if any, accrued before or after the parties reached their settlement agreement because the obligation here was discharged in either instance. Wilson-Gaskins agreed to "release and forever discharge Kaye . . . of and from any and all actions claims and demands . . . **now existing**. . . ." (emphasis added). This language has the effect of releasing and immediately discharging any obligation Kaye may have owed to Wilson-Gaskins. Critically, a breach of contract action is unsustainable based on a violation of this

25

language because Wilson-Gaskins's performance was complete immediately upon assenting to the agreement.

The language of the agreement also provides, however, that Wilson-Gaskins "does release and forever discharge Kaye . . . of and from any and all actions claims and demands . . . **which may hereafter arise** . . . or **which may develop**, whether or not such consequences are known or anticipated." (emphasis added). Under the common law rule, Wilson-Gaskins could not release claims "which may hereafter arise . . . or which may develop" because she could not discharge obligations which were not yet owed to her. This passage, then, must be interpreted as a promise to forever forbear from litigating matters that fall within the agreement's scope. Although we hold that Wilson-Gaskins's agreement to release claims which have yet to arise is an executory covenant never to sue, we nevertheless hold that those claims were discharged at the precise moment when the claims became viable.

For the reasons stated in Part II, *supra*, as between the parties we will generally construe a promise never to sue as a discharge of obligations that later arise and that are within the scope of the agreement. In such an instance, the promise never to sue remains executory in nature. As soon as the obligee's claim against the obligor becomes viable that claim is discharged automatically as a matter of law. Simultaneously, the obligee's performance under the covenant never to sue is complete, and the obligee's obligation is discharged. On the other hand, we will construe a promise never to sue as an ongoing

26

executory promise that can be breached if we can clearly discern from the agreement's text that the parties intended for the obligor to recover consequential damages resulting from the obligee's failure to honor that discharge.

The question, then, is whether we can discern from the text of the parties' agreement an intent that Wilson-Gaskins would be liable for damages resulting from her failure to honor her release. In the parties' settlement agreement, Wilson-Gaskins purports to "release and forever discharge" obligations that are either owed to her or may become owed to her. Critically, nowhere in the agreement does Wilson-Gaskins purport to undertake the affirmative obligation to refrain from suing Kaye. Moreover, assuming *arguendo*, that we could discern from this agreement that Wilson-Gaskins breached a promise never to sue Kaye for claims within the agreement's scope, we further observe that Kaye made a reciprocal promise to release Wilson-Gaskins from claims "which may hereafter arise out of the legal representation of Wilson[-Gaskins] . . . including any consequences thereof now existing or which may develop." The significance of this fact is that the construction Kaye advocates would give rise to a circuity of action. Indeed, Kaye's construction would create litigation's equivalent of an infinity mirror; whereby Wilson-Gaskins's breach provides Kaye a cause of action that, upon executing, he becomes liable to Wilson-Gaskins for his breach. Indeed, this process would continue in perpetuity.

Our review of the parties' agreement reveals no indication that Kaye bargained for consequential damages resulting from Wilson-Gaskins's failure to honor the release she

27

provided. Without a clear expression that Wilson-Gaskins was to be bound by an ongoing promise not to litigate against Kaye, and that Wilson-Gaskins would be liable for the consequential damages resulting from the breach of that promise, we hold that the parties' covenant never to sue operated as a release and performance was complete upon the consummation of the agreement. As such, Kaye cannot pursue a breach of contract claim when Wilson-Gaskins had executed her release, and thereby completed performance which discharged her obligation under the agreement. We, therefore, hold that the circuit court did not err in granting Wilson-Gaskins's motion to dismiss Kaye's breach of contract claim.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**